UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK                X

JENNIFER GARCIA JIMENEZ, JENNIFER GARCIA
JIMENEZ on behalf of her minor daughter "J.M.",
FRANKLIN CAMPOVERDE, and JOAN MANUEL
JIMENEZ,                         Plaintiffs

                    v.                                          # 23-cv-09476 (AMD/SIL)

COUNTY OF SUFFOLK, SUFFOLK COUNTY POLICE
DETECTIVE SOLON PARKER, POLICE OFFICER
DANIEL LILLIS, TOWN OF EAST HAMPTON, EAST
HAMPTON TOWN POLICE DETECTIVE RYAN HOGAN,
POLICE OFFICER ANDREW BLODORN, POLICE
OFFICER BRYAN COBB, POLICE DETECTIVE DAVID
ORLANDO, POLICE OFFICER TYLER GILBRIDE,
POLICE DETECTIVE MICHAEL COLEMAN, POLICE
DETECTIVE LUKE McNAMARA, POLICE OFFICER
JUAN BUITRAGO, POLICE DETECTIVE ARTHUR
SCALZO, POLICE OFFICER KATHERINE IZZO,
                              Defendants.
_____X

## **SECOND AMENDED COMPLAINT**

Plaintiffs JENNIFER GARCIA JIMENEZ (herein "GARCIA JIMENEZ"), JENNIFER

GARCIA JIMENEZ on behalf of her minor daughter J.M. (herein "J.M."), FRANKLIN

CAMPOVERDE (herein "CAMPOVERDE"), and JOAN MANUEL JIMENEZ ("JIMENEZ")

pursuant to the Federal Rules of Civil Procedure and otherwise, hereby file this Second

Amended Complaint ("SAC") against COUNTY OF SUFFOLK ("COUNTY"), SUFFOLK

COUNTY POLICE DETECTIVE SOLON PARKER ("PARKER"), POLICE OFFICER

DANIEL LILLIS ("LILLIS"), TOWN OF EAST HAMPTON ("TOWN"), EAST HAMPTON

TOWN POLICE DETECTIVE RYAN HOGAN ("HOGAN"), POLICE OFFICER ANDREW

BLOWDORN ("BLODORN"), POLICE OFFICER BRYAN COBB ("COBB"), POLICE

DETECTIVE DAVID ORLANDO ("ORLANDO"), POLICE OFFICER TYLER GILBRIDE

("GILBRIDE"), POLICE DETERCTIVE MICHAEL COLEMAN ("COLEMAN"), POLICE

DETECTIVE LUKE McNAMARA ("McNAMARA"), POLICE OFFICER JUAN BUITRAGO ("BUITRAGO"), POLICE DETECTIVE ARTHUR SCALZO ("SCALZO") and POLICE OFFICER KATHERINE IZZO ("IZZO"), and state as follows:

## PRELIMINARY STATEMENT

1.. Plaintiffs allege violations under the 14th Amendment, incorporating aspects of the 4th Amendment insofar as the conduct of over two dozen law enforcement officers who participated in the execution of a "no knock search warrant" at Plaintiffs' residence on October 5, 2022. The law enforcement officers included at least a dozen employed by the COUNTY OF SUFFOLK, at least 8 from the TOWN OF EAST HAMPTON, and at least three from the COUNTY's East End Drug Task Force ("EEDTF"). Plaintiffs allege that during the incident, approximately $10,000.00 was taken away from GARCIA JIMENEZ and CAMPOVERDE (who were legally married) from unidentified police officers, and that approximately $4,000.00 was taken away from JIMENEZ by unidentified police officers, and that money has continuously been withheld from them without any legal right to do so, (2) that they were subjected to the unconstitutional use of "excessive force" in various manners and for an unreasonably lengthy duration of time, and that (3) all of the named individual defendants purposely failed to intercede to prevent continuing civil rights violations in each other's presence when there was an opportunity to do so during the 3 hours in which they were detained in police custody and subjected to the unconstitutional use of "excessive force" , (4) that they suffered pain, suffering, and physical and emotional harm by being unreasonably restrained for over 3 hours using excessive force during which their liberty interests were purposely wrongfully seized for an excessive duration and in an unreasonable manner (including physical symptoms associated with such distress), and (5) that they suffered from intentional denial of necessary medical treatment for physical injuries which JIMENEZ and CAMPOVERDE suffered due to the conduct of law enforcement officers due to

2

the manner of handcuffing behind-their-back for 3 hours after they sustained injuries due to the COUNTY's officers' execution of the "no knock search warrant". They seek damages under 42 U.S.C. §1983 and attorneys fees under 42 U.S.C. §1988 & 28 U.S.C. § 2412.

2. As an alternative theory of recovery, the claims include common law torts under New York State common law, and case precedent interpretations which creates a "special duty" owed by all law enforcement officers executing a "no knock search warrant", see *Ferreira v. City of Binghamton*, 38 N.Y.3d 298 (2022), which duty includes avoiding the poor planning errors here.

3. <u>**SUMMARY OF CONTENTS**</u>

PARTIES, JURISDICTION AND VENUE...............................................................  3

ALLEGATIONS COMMON TO ALL COUNTS……………………………....  7

COUNT I: VIOLATION OF PLAINTIFFS' FOURTH AMENDMENT
    RIGHTS MADE APPLICABLE UNDER THE FOURTEENTH
    AMENDMENT UNDER 42 U.S.C. § 1983 …..……………………..…..  17

COUNT II: DAMAGES ARISING FROM UNLAWFUL TORTIOUS
    CONDUCT UNDER NEW YORK COMMON LAW…..……………  20

    A. ASSAULT AND BATTERY…………………………………………  20

    B. NEGLIGENCE…..……………………………………………………  21

RELIEF REQUESTED..........................................................................................  23

<u>**PARTIES, JURISDICTION AND VENUE**</u>

4. Plaintiff JENNIFER GARCIA JIMENEZ is a resident of Suffolk County, New York.

5. Plaintiff J.M (herein "J.M.") is a resident of Suffolk County, New York and she is the daughter of GARCIA JIMENEZ.

6. Plaintiff FRANKLIN CAMPOVERDE (herein "CAMPOVERDE") was a resident of Suffolk County, New York in 2022-2023. He married GARCIA JIMENEZ in 2016.

7. Plaintiff JOAN MANUEL JIMENEZ (herein "JIMENEZ") is a resident of Suffolk County, New York. JIMENEZ is GARCIA JIMENEZ's brother.

8. Defendant COUNTY OF SUFFOLK (herein "COUNTY") is a County located on the easternmost portion of Long Island, New York,

9. Defendant SUFFOLK COUNTY POLICE DETECTIVE SOLON PARKER (herein "PARKER") is a detective who signed the Affidavit under oath for the purpose of obtaining the issuance of the "no knock search warrant" here and 4 others. He was also present at the house.

10. Defendant POLICE OFFICER DANIEL LILLIS (herein "LILLIS") is/was employed by the Town of Southold and is/was a member of the COUNTY's East End Drug Task Force. Suffolk County District Attorney's East End Drug Task Force is comprised of members of Suffolk County District Attorney Investigators, East Hampton Town Police Department, New York State Police, Riverhead Police Department, Southold Police Department, Southampton Town Police Department, Suffolk County Police Department and the Suffolk County Sheriff's Department. LILLIS's name is on "receipts" attached to a document signed, or pre-signed, by PARKER, which states "SEE ATTACH PROPERTY INVOICE SHEETS".  LILLIS was physically present at the house on the morning of October 5, 2025 and observed the conditions under which Plaintiffs were detained and unconstitutionally restrained.

11. Defendant TOWN OF EAST HAMPTON (herein "TOWN") is a town located in the easternmost part of Long Island. It extends from the Village of Sag Harbor eastward to Montauk.

12. Defendant EAST HAMPTON TOWN POLICE DETECTIVE RYAN HOGAN ("HOGAN") was/is a Police Detective. He participated in planning and coordinating these events and HOGAN was present at the house during the execution of the "no knock search warrant" and observed the conditions under which Plaintiffs were detained and unconstitutionally restrained. As the designated spokesperson for the TOWN, HOGAN stated to a local news reporter that

4

"We executed the search warrants all at the same time", he publicly offered "kudos" to all the agencies involved in the investigation and arrests of the persons arrested, and explained that the TOWN of EAST HAMPTON's Police Department "use[d]" the COUNTY's East End Drug Task Force and the Suffolk County Police Department, Suffolk County Sheriff's Department and other agencies "to do stuff we couldn't do on a regular basis."

13. Upon information and belief, BLODORN and COBB are regularly employed by the Town of Southampton and on October 5, 2022, they both entered Plaintiffs' house as part of their involvement with the EEDTF in the capacity of searching the premises for drugs or contraband, neither of which were present at the premises.

14. Upon information and belief, ORLANDO, GILBRIDE, COLEMAN, McNAMARA, BUITRAGO, SCALZO, and Katherine IZZO are law enforcement officers regularly employed by the TOWN.  At the time of the events complained of they were supervised by the Police Chief Michael Sarlo and the Police Commissioner Peter Van Scoyac, who was then the TOWN's Supervisor. Van Scoyac expressly approved the TOWN's policing and "use of force" procedures by  certified signature in March 2021 on a document submitted to Governor Cuomo's office. The policies and procedures that concern the duty to intervene and intercede to prevent the use of excessive force were constitutionally inadequate because they did not expressly require the TOWN's officers to intercede and intervene in the ongoing unconstitutional acts of all officers.

15. Defendants who are persons named in the caption caused the harm complained of herein. They are sued in their official and individual capacities. All their affirmative acts are not yet known to Plaintiffs because of efforts to conceal them.  They are people who deliberately and intentionally jointly acted  and/or failed to act or intercede in the acts of other law enforcement officers to prevent their continuing use of unconstitutional "excessive force" and they are sued herein in their official and individual capacities as tacit collaborators in the unconstitutional acts.

16. Jurisdiction is based on Plaintiffs' federal claims under 42 U.S.C.§ 1983 (civil rights):

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia. (As amended Pub. L. 104-317, title III, Section 309(3) Oct. 19, 1996, 110 Stat. 3853.)

17. Federal Courts have jurisdiction in matters where state actors deprive a plaintiff of a federal right and that deprivation resulted from "the exercise of some right or privilege created by the State or by a rule of conduct imposed by the state or by a person for whom the state is responsible" and "the party charged with the deprivation [is] a person who may fairly be said to be a state actor" either "because he is a state official, because he has obtained significant aid from a state official, or because his conduct is otherwise chargeable to the State." *Lugar v. Edmonson Oil Co.,* 457 U.S. 922, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982).

18. This action is timely commenced under 42 U.S.C. § 1983 because in New York the statute of limitations is 3 years plus such additional days that extends the 3 year period if the final calendar day falls on a weekend or a public holiday. *Wilson v. Garcia*, 471 U.S. 261 (1985).

19. Venue is proper under 28 U.S.C. § 1391(a) because the claims arose in the County of Suffolk.  All parties are subject to the venue of this Court.

20. Where some of Plaintiffs' claims rest exclusively on New York State law, Plaintiffs request the Court adjudicate them under the supplemental jurisdiction, 28 U.S.C. § 1367.

21. All conditions precedent to this action have been satisfied and this case is timely

commenced under 42 U.S.C. § 1983 and New York State law which provides for a statute of limitations of 1 year and 90 days for intentional torts when a Notice of Claim is filed (see NY General Municipal Law § 50-I (1)(c) (["one year and ninety days after happening of the event"]):

a. Plaintiff GARCIA JIMENEZ filed a Notice of Claim against COUNTY OF SUFFOLK, et al. on November 10, 2022, and COUNTY declined set a § 50-h hearing;

b. Plaintiff GARCIA JIMENEZ filed a Notice of Claim against TOWN OF EAST HAMPTON, et al. on November 14, 2022. and she attended a § 50-h hearing;

c. Plaintiff CAMPOVERDE filed a Notice of Claim against COUNTY OF SUFFOLK, et al. on November 10, 2022, and COUNTY declined to set a § 50-h hearing;

d. Plaintiff CAMPOVERDE filed a Notice of Claim against TOWN OF EAST HAMPTON, et al. on November 14, 2022, and he attended a § 50-h hearing;

e. Plaintiff JIMENEZ filed a Notice of Claim against COUNTY OF SUFFOLK, et al. on November 10, 2022, and COUNTY declined to set a § 50-h hearing;

f. Plaintiff JIMENEZ filed a Notice of Claim against TOWN OF EAST HAMPTON, et al. on November 14, 2022, and did not attend a § 50-h hearing for legitimate reasons.

22. A formal notice of claim is not required for federal court jurisdiction over civil rights violations asserted against a municipality or governmental law enforcement body under 42 U.S.C. § 1983.  See *Felder v. Casey*, 487 U.S. 131, 108 S. Ct. 2302, 101 L.Ed.2d 123 (1988). See also *Crist v. Town of Greenburgh*, 156 F.R.D. 85 (S.D.N.Y. 1994).  No formal Notice of Claim pursuant to New York General Municipal § 50-h is required.

## ALLEGATIONS COMMON TO ALL COUNTS

23. Upon information and belief, in 2022 the TOWN intentionally began a law enforcement strategy of not promptly arresting sellers of unlawful drugs who sold drugs to undercover police officers in Montauk, deliberately delaying arrests even where there was

7

probable cause to make such arrests.

24.  Upon information and belief derived from an EEOC complaint, in mid-August 2022, HOGAN complained to senior law enforcement officials in the TOWN, including Detective Sergeant Daniel Toia, that one of the TOWN's female police officers had "ruined" an "investigation" operation that was in progress concerning sales of drugs. This female police officer eventually filed a federal gender discrimination lawsuit, which expressly described in detail the TOWN's aversion to her promotion to the Detective Division despite ger well-documented objective qualifications. (*Andrea M. Kess v. Town of East Hampton et al* – 24-CV-06226, ECF No. 1, ¶¶ 78 et seq, esp. 111 & 116).

25. Earlier in 2022, the TOWN, Town Police Chief Sarlo, HOGAN, Detective Sergeant Toia, COUNTY and the Suffolk County East End Task Force deliberately refrained from making 4 arrests of persons whom they suspected had unlawfully sold drugs, deliberately accumulating such known criminal incidents until a chaotic and dynamic group arrest was made with fanfare on October 5, 2022.

26. On or about October 4, 2022, acting as a complaining witness, PARKER signed a sworn Affidavit associated with an application for a "no knock search warrant" at 361 Flamingo Avenue, Montauk NY, 11954, where all Plaintiffs then resided.

27. Upon information and belief, PARKER's sworn Affidavit was generated with the objective of seeking unannounced SWAT team-style entry onto the premises of 361 Flamingo Avenue, Montauk NY on October 5, 2022, a residence located close to a prominent intersection near the fishing harbor, other residences, and commercial buildings.

28. On October 4, 2022, New York State Supreme Court Justice Steven A. Pilewski signed a No Knock Search Warrant as a result of PARKER's affidavit and the application.

29. On or about October 5, 2022, the "no knock search warrant" was executed by various

8

law enforcement officials at 361 Flamingo Avenue, Montauk, with the direct personal involvement of HOGAN, Police Michael Sarlo and Detective Sergeant Daniel Toia.  Officers BLODORN, COBB, HOGAN, ORLANDO, GILBRIDE, COLEMAN, McNAMARA, BUITRAGO, SCALZO, and Katherine IZZO were physically present at the physical location of Plaintiffs' house.

30. As part of the TOWN's policy, practice, and custom, the TOWN required its officers to defer to the more aggressive policing tactics of the law enforcement officers of the COUNTY and DEA when those officers engaged in execution of a No Knock Search Warrant in Montauk.

31. In accordance with custom, policy and practice of the law enforcement practices of the COUNTY, TOWN, COUNTY's East End Drug Task Force (EEDTF), law enforcement officers barged into Plaintiffs' home at about 6:00 A.M. without a preannounced entry and they began shouting. The first officers who arrived were wearing military uniforms and helmets, dressed like SWAT team members. These officers were attired in black clothing that covered their bodies, their faces, and their hands, which made it impossible for Plaintiffs to identify them with specificity. (Plaintiffs have been unable to ascertain the identities of this very first wave of officers because of a conspiratorial custom and practice of a "blue wall of silence" in the relevant law enforcement communities and commands.) These officers pointed guns at CAMPOVERDE, JIMENEZ, and J.M., a petite 11-year-old female (CAMPOVERDE's stepdaughter).

32. Approximately 30 officers entered, trampled, and trudged through the residence at 361 Flamingo Avenue on that day, drawing a crowd of gawking onlookers, including some of the TOWN's officers who attentively observed events from in front of a nearby Goldberg's Deli.

33. Initially 2 or 3 specific officers began to ask CAMPOVERDE where the drugs and money were, while holding a gun to his face. One officer was old, with white hair, about 5'6". The other was approximately 5'3" and a third was tall and heavyset. The officers were wearing

9

jeans with a black vest and the younger one had a long beard and he threatened CAMPOVERDE that he was going to break everything in the house. The 3 officers placed handcuffs on CAMPOVERDE, twisting his arm as they tightened the handcuffs too tight behind his back, using excessive force which injured his shoulder. Those officers, and others, broke many things in the house that day, including doors, closets, and lamps. They threw clothes from the closet everywhere including where there was water and coffee, deliberately staining the clothes.

34. At the time of the initial entry, 4 officers who were completely covered in black attire attempted to barge into the bathroom where JIMENEZ was, using excessive force and causing the unlocked bathroom door to impact against JIMENEZ's foot, causing severe injury and profuse bleeding between his toes. The tallest (muscular, 6') of the 4 officers used a battering ram. He put the first set of handcuffs on JIMENEZ, using excessive force, while all 4 observed his serious and bloody injury. Before that set of 4 officers left, JIMENEZ was re-handcuffed by a different officer (6', not as muscular), in the presence of the older Caucasian officer 5'6", who again twisted JIMENEZ's arms roughly and placed the handcuffs on his wrists behind him too tightly, causing JIMENEZ pain. The officers (mostly) held CAMPOVERDE and JIMENEZ, in their handcuffs, standing in the living room of the 3 bedroom, 1 bath house for 3+ hours. Various officers also questioned each privately and made threats of "jail", moving them around to do so.

35. After the officers pushed CAMPOVERDE into the living room, the small 5'3" officer went into CAMPOVERDE's bedroom with 2 others and a photographer, and they closed the door. The officers seized over $10,000.00 from that bedroom. JIMENEZ saw a 6' tall officer and others enter his shared bedroom and close the door; $8,000.00+ was seized from it.

36. During their control of the house for over 3.5 hours, the officers repeatedly asked where drugs and weapons were located and, when CAMPOVERDE and JIMENEZ denied having any, the officers sadistically laughed at them as they suffered in their captive conditions.

10

CAMPERDE and JIMENEZ asked to have their handcuffs loosened, or at least re-cuffed in front of their bodies, and their requests were refused, in the presence of other officers. In the presence of officers from the TOWN, CAMPOVERDE and JIMENEZ were subjected to pain, torture and suffering for an unreasonable length of time, even after it was obvious that there were no drugs or contraband anywhere on the property. Although it was objectively obvious that the application of physical force was unnecessary under these circumstances for such a prolonged period of time, about 3.5 hours, and unconstitutionally excessive under precedent, *Curry v. City of New York,* 316 F.3d 324, 332 (2d Cir. 2003), the TOWN's participating officers did not intercede to prevent this continuing harm to them. Upon information and belief, the TOWN's officers followed the TOWN's own policy, practice and custom of deferring to the COUNTY's policy, practice, and custom of unconstitutional "excessive force handcuffing", and thus the TOWN's officers present at the home purposely did nothing to stop it.

37. CAMPOVERDE asked to speak to someone in charge at least twice, and both times he was dismissively told that the officer in charge was "on his way".

38. The officers searched throughout the house repeatedly, and they found no drugs or contraband. They did find some cash, seizing all of it and stealing most of it. LILLIS (who was physically present at the house and observed FRANKLIN and JOAN being handcuffed wearing behind-the-back handcuffs and being ordered to stand against the wall in the living room for hours) was tasked with compiling the receipts for the cash and property that was removed from the house. LILLIS failed to include any reference to, or any accounting of, about $10,000 taken from the safe box in GARCIA JIMENEZ and CAMPOVERDE's marital bedroom and about $4,000.00 taken from inside the drawer of the nightstand by JIMENEZ's bed in his shared bedroom.

39.  The group of officers ultimately released the adult men from the behind-the-back handcuffs, and they left the house over 3.5 hours after they arrived, taking along all of the cash in the house, cellphones, CAMPOVERDE's and GARCIA JIMENEZ's marriage license, car titles, a "Nokia" camera (never returned) and computers (2 of which were CAMPOVERDE's and 3 which were GARCIA JIMENEZ's), including a computer used for schoolwork by GARCIA JIMENEZ's minor son (which CAMPOVERDE begged the officers not to remove, to no avail).

40. The officers did not leave any receipts nor any inventory, despite the state statutory law. NY CPL § 690.50 (4) and (5).

41.  Not until when they were finally leaving did they show CAMPOVERDE a copy of the Search Warrant..

42.  The officers never revealed their names or badge numbers to Plaintiffs but their identifies are known to their respective law enforcement agencies. Every officer of COUNTY, TOWN and EEDTF who participated in executing the search warrant at that house observed the prolonged and excessive handcuffing which was an objectively unreasonable, unconstitutional restraint of CAMPOVERDE's and JIMENEZ's liberty interests. Yet none of them intervened to prevent that civil rights violation in their presence although there was ample opportunity to do so because the handcuffing lasted over 3 hours, long after actual searching in a small house ended.

43.  While officers kept JIMENEZ in custody for over 3 hours, they failed to provide medical assistance for his bleeding foot as it was painfully throbbing. One or more officers told JIMENEZ that he would have to personally pay for an ambulance or for a medical consultation, declining to call the East Hampton volunteer ambulance, which routinely (as all TOWN officers know) provides free transportation services to a medical facility and free on-site medical care.

44. The officers kept CAMPOVERDE's 11-year-old step-daughter J.M. inside the house, whilst GARCIA JIMENEZ was across the street intensely worrying about J.M's safety and

begging the officers to bring J.M. to her. Although GARCIA JIMENEZ was miles away from her home when officers entered the home at 6:00 A.M., the officers detained GARCIA JIMENEZ outside of her vehicle for hours once she arrived near the home to check on J.M..

45. The officers kept J.M. separated from her mother for nearly an hour, while intermittently asking her questions. They did not permit J.M. to use the home's toilet to urinate (as she normally does frequently because of a history of medically documented urinary tract infections).

46. Plaintiffs did not see any female officers present at 361 Flamingo Avenue for the child's welfare (although later a female officer was seen at Goldberg's Bagels). The absence of a female police officer (or the presence of only a single female officer such as IZZO for some of the time that Plaintiffs JENNIFER and J.M. had their liberty interests restrained and their access to any toilet denied) is a consequence of the TOWN's gender discrimination policies that have deliberately refused to add any female detective to TOWN's Detective Division. (*Andrea M. Kess v. Town of East Hampton et al* – 24-CV-06226, ECF No. 1, ¶¶ 78 et seq, esp. 111 & 116).

47. Eventually, a tall, thin male officer took J.M. across the street to her mother, and the officers forced both GARCIA JIMENEZ and J.M. to stand outside her car in the presence of gawking onlookers and refused to allow either of them to use any toilet facility.

48. Despite their multiple requests to use a toilet during the period of their prolonged detention, the officers denied the female Plaintiffs their right to exercise their right to engage in those essential bodily functions. The officers forced GARCIA JIMENEZ and J.M. to stand in the rain, while "holding" their urine, impairing their major genitourinary, bowel and bladder functions. TOWN's local codes §§ 82-6 and 82-10 prohibit public urination, imposing 15 days jailtime and a $250.00 fine. Violations of the code against public urination can trigger arrests.

49. CAMPOVERDE could see them from the home's window, while they were suffering from pain and discomfort by being forced to stand outdoors in the rain.

50. Eventually, in response to GARCIA JIMENEZ's begging, the officers allowed her and J.M. to sit inside GARCIA JIMENEZ's car, but they still refused to allow them to use a toilet inside the house, at a neighbor's house, or at a local commercial business. No portable toilets, or "port-a-potties" were brought to the scene of the execution of the "no knock search warrant", which continued for over 3 hours when Plaintiffs GARCIA JIMENEZ and J.M. were detained in police custody without any sanitation access.

51. The officers departed at about 10:00 AM. CAMPOVERDE approached the TOWN's nearby police officers stationed near Goldberg's Deli, wanting to obtain medical assistance for JIMENEZ and file a police report. The TOWN's officers rebuffed him and directed him to call the police station, refusing to fully document the report or call "Dispatch" to send an ambulance.

52. As the result of the foregoing, Plaintiffs suffered physical bodily injury and emotional distress, intense pain, suffering, humiliation, reputational harm, embarrassment, shame, fear, terror, shock, stress and anxiety.

53. Plaintiffs' personal property also sustained damage (e.g., phones, computers), which became apparent by the time that some of it was returned. Receipts signed by LILLIS show his involvement in preparation of receipts at some point.

54. The TOWN's Police Officers and (upon information and belief) those from the detective division then went around to the workplaces of CAMPOVERDE and JIMENEZ, falsely telling their employers and work associates that their house was raided by the kaw enforcement officers because they were involved in the distribution of drugs, although the officers knew by then no drugs were found at their house during a 3.5-hour search.

55. Plaintiffs made several attempts to have their property returned to them, including the cash. However, those attempts were not substantially successful, as over $14,000.00 is still unaccounted for, despite the strenuous efforts of Plaintiffs and their attorney.

14

56.  Defendants have deliberately withheld a substantial amount of Plaintiffs' cash from them, and Defendants have not returned (nor properly accounted for) all of Plaintiffs' property which was removed from 361 Flamingo Avenue by some law enforcement officers on October 5, 2022. The computers and cellphones that were returned (after a long time) were returned in damaged and broken condition. GARCIA JIMENEZ's newly purchased iPhone that was in a box on the coffee table (awaiting return to the store full for a refund) was belatedly made available for a pick up at the SCPD's Property Division in Yaphank in its damaged condition so that iPhone could not be returned for a credit.

57. CAMPOVERDE initiated a SCPD Internal Affairs Investigation [#22-473i], however that investigation did not achieve a positive result because the law enforcement officers have not provided sufficient factual information to the investigator Sgt. Andrew Cattani. Upon information and belief, the law enforcement officers who were at the premises have not provided their body camera video footage to SCPD Internal Affairs. SCPD Detective PARKER was a complaining witness to obtain the Search Warrant and signed a document dated October 12, 2022 referencing the items seized but it was not until June 27, 2025 that his legal counsel finally confirmed PARKER's presence the house during the execution of the "no knock search warrant", showing PARKER's direct involvement. Police Commissioner Harrison failed to compel COUNTY's officers to cooperate with Sgt. Cattani.

58. CAMPOVERDE telephoned and emailed Suffolk County Police Commissioner Harrison  directly on more than one occasion, but Police Commissioner Harrison did not return his calls nor emails prior to Harrison's retirement.

59. Defendants COUNTY and TOWN have not financially compensated Plaintiffs for their damages and losses, despite the filing of 6 notices of claims.

60. The COUNTY failed to set any §50-h hearings for the Plaintiffs' demands.

15

61. In response to each of the 3 "Notice of Claim" demands timely filed with the County Clerk, COUNTY's Deputy Attorney Susan Flynn stated the following (although for purpose of § 1983, the investigative and administrative activities of the COUNTY's employees are attributed to COUNTY and the "proof, by affidavit" to obtain the "no knock search warrant" was made by "Detective Solon Parker, Shield No. 1175"): "The County of Suffolk is not legally responsible for the Town of East Hampton or its Police Department".

62. To attempt to recover the money taken from them, and to acquire additional information about the individuals and agencies responsible for their injuries, Plaintiffs sought the services of an attorney to assist them in State Court. Notwithstanding those efforts made through correspondence to the Acting State Court Justice who signed the "no knock search warrant", Plaintiffs were not yet sufficiently informed about the names of any the persons who were present at their home on October 5, 2022, until May 2025 (and some names of individuals such as PARKER and IZZO were withheld until weeks later).

63. The law firm that the TOWN retained to conduct the § 50-h examinations of Plaintiffs took aggressive and confrontational positions that continued to withhold the officers' identities.

64. Defendants ignored the New York Court of Appeals' opinion in *Ferreira v. Binghamton*, 38 NY3d 298 (2022), responding to certified question, in *Ferreira v. City of Binghamton,* 975 F.3d 255 (2d Cir. 2020),which held that all policers and the counties and municipalities that employ them, owe a "special duty" to persons injured in the execution of a "no knock" search warrant, even if such injuries occur as result of by negligence.

65. Defendants  deliberately failed to provide for the emergency medical services that were objectively and subjectively anticipated in connection with the execution of all 5 "no knock" search warrants. By custom and practice, the TOWN's written "use of force" policy is/was disregarded for drug raids.

16

66. Upon information and belief, in late November or early December 2023, the criminal charges against 2 of the 4 persons arrested on October 5, 2022, were resolved with fines (including State mandated "surcharges") of less than $800.00 each, and over $16,000.00 was returned to one of them because that money was not associated with any crime. By December 25, 2023, over $33,000.00 of the "$35,000.00" seized amount publicized by Suffolk District Attorney Raymond A. Tierney had been returned to other victims of the unconstitutional "drug raid", yet over $14,000.00 of Plaintiffs' funds have not been returned to them. Defendants' accountings are suspicious. Lt. Toia also told a federal investigator in late 2023 that "a large sum of money" was seized from Plaintiffs' house pursuant to a search warrant, yet the sums LILLIS actually recorded on receipts cannot be considered to be "large" for a home occupied by 4 adults.

### COUNT I:
### VIOLATION OF PLAINTIFFS' FOURTH AMENDMENT RIGHTS MADE APPLICABLE UNDER THE FOURTEENTH AMENDMENT UNDER 42 U.S.C. § 1983

67. Plaintiffs incorporate ¶¶ 1-66 above, as if fully set forth herein.

68. Amendment IV of the United States Constitution states:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

69. Defendants deprived Plaintiffs of their 4th/14th Amendment rights in at several ways.

70. There were constitutional violations of "excessive force" initiated by officers who are still unidentified. It is well established that lengthy and very tight and behind-the-back handcuffing can be a Fourth Amendment violation which is applicable to state actors under the 14th Amendment. See *Soukaneh v. Andrzejewski*, 112 Fed. 4th 107 (2d Cir. 2024). The ratio of the large number of officers to only 2 male occupants in the home are one of the

factors to consider in evaluating whether that degree of force used was excessive in both manner and length of time. The Defendants purposeful "failure to intercede to prevent a continuing constitutional law violation" of the excessively tight behind-the-back handcuffing, hour after hour, is a $4^{th}/14^{th}$ Amendment violation. The law enforcement officers inside and outside the small one-story house would have been able to intercede (intervene) to prevent the continuing wrongful use of excessive force but all of them failed to do so. Defendants could have contacted their most superior officers using their cellphones when they observed the excessive period of handcuffing of injured individuals who were in physical pain to out a stop to the constitutional violations but Defendants did nothing to cause a superior officer to stop the continuing excessive force from being inflicted, nor to stop it. Upon information and belief, all Defendants observed the manner in which JOAN and FRANKLIN were being held, including GILBRIDE who was stationed outside the house for traffic control but could observe FRANKLIN through the window inside house.

71. There were also constitutional violations by excessive force as result of the observable condition of the female Plaintiffs not being afforded any access to toilets, and this is an observation that GILBRIDE made and purposefully declined to intercede about. The denial of "sanitation access" to a detained person is a constitutional violation that falls within the penumbra of the use of excessive force by a Fourth Amendment violation. However primitive and ordinary the right to defecate and urinate without awaiting the permission of the government, and, while eating or at rest, the right to avoid the odor of one's earlier emitted feces and urine, are rights close to the core of the liberty guaranteed by the due process clause of the 14th Amendment. Defendants observed that no provisions was made by the government for toilet access for individuals detained for over 3 hours, constituting an unacceptable level of lack of humaneness to confine Plaintiffs in a manner when he or she must solicit freedom to use a toilet.

72. The execution of the "no knock search warrant" was planned months in advance by the Town of East Hampton's highest ranking law enforcement officers, particularly by HOGAN. The lack of mobile toilet facilities ("port-a-potties"), the lack of a constant presence of a female officer to facilitate the essential bodily needs of the female mother and 11-year-old daughter to urinate and defecate, the absence of the (free) East Hampton Volunteer Ambulance vehicle with staffed EMT professionals to lend medical assistance to JOAN's bleeding wound evinces an intentional failure to intercede  (intervene) to prevent the continuing "use of excessive force" by other officers who were associated with the Suffolk County Police Department and the Suffolk County District Attorney's Office. The term "fellow officers" encompasses all officers coordinating on the teams which were involved in the planned law enforcement activities on October 5, 2022 at this house.

73. It is well established that municipal police officers have a duty to intercede to prevent a civil rights violation in their presence where there is time to prevent the violation and/or to prevent the violation from continuing. *Figueroa v. Mazza*, 825 F.89, 106 (2d Cir. 2016)") citing *O'Neill v. Krzeminski*, 839 F. 2d 9, 11-12 (2d Cir. 1988). By failing to take any steps to stop these violations, Defendants became "tacit collaborators" in the illegality with the unidentified officers who thrust the door into JOAN's foot when they rammed the bathroom door with a battering ram and deliberately placed the sets of handcuffs on too tightly.

74. The constitutional violation of failure to intercede to prevent the continuation of any constitutional violation is an important where, as here, (where other law enforcement officers deliberately disguised their identities from Plaintiffs by wearing balaclavas, eschewing identifying name and number badges) Defendants declined to take action by a simple step of calling for medical assistance repositioning handcuffs in front rather than in back, allowing the male Plaintiffs to sit on the living room coach, and ensuring "sanitation access" during captivity.

75. The physical forces used by the law enforcement officers present at 361 Flamingo Avenue on October 5th, 2022 (and recklessness and deliberate indifference shown by other officers who were not present on that day and yet failed to investigate the events) were also excessive, thus unnecessarily burdening Plaintiffs' liberty and property interests and rights to bodily integrity to a degree that shocks the conscience because of an absence of proportionality, given all facts known to Defendants, including the reckless indifference to Plaintiffs' medical and health needs during the prolonged investigative period, and the trauma endured by J.M.

76. The excessive force used at 361 Flamingo Avenue, and in the general vicinity of that address, concretely demonstrates a plan, device and design which far exceeded the scope of any legitimate mission.

77. The fact that so many law officer Defendants  failed to intercede, failed to intervene, failed to take any action to stop the constitutional violations from continuing indicates that the TOWN and the COUNTY both have policies and customs that condone that failure to intercede to prevent constitutional violations of the use of excessive force from continuing.

78. The aforesaid conduct by all Defendants caused damages to Plaintiffs..

**COUNT II:**
**DAMAGES ARISING FROM UNLAWFUL TORTIOUS**
**CONDUCT UNDER NEW YORK COMMON LAW**

79.   Plaintiffs incorporate Paragraphs 1-66 and 68-78 as if fully set forth herein.

**A.  ASSAULT AND BATTERY**

80. Defendants engaged in a pattern of conduct that was intended to place Plaintiffs in fear of bodily harm and such conduct did so. Defendants also caused bodily harm to Plaintiffs, intentionally, causing them harm, by their failures to intercede, without a legal privilege to do so. Defendants have still not identified which law enforcement officers used the battering ram to cause the harm to JOAN's flesh, which bled profusely as he was forced to stand for hours.

## B. NEGLIGENCE

81. Defendants owed a duty of care to Plaintiffs not to cause harm to them in these circumstances, including the "special duty" owed  by them to Plaintiffs by law enforcement officials who are involved in the acquisition and/or execution of a "no knock", and Defendants breached those duties, causing harm to Plaintiffs. Plaintiffs were damaged as a consequence.

82. The negligence claims asserted here are alternative claims because of the possibility that one of more Defendants may have acted, or failed to act, contrary to their duty to care and their constitutional obligations but, nevertheless, without the deliberate intent to cause the harm that was caused as result of their failure to perform their law enforcement duties correctly.

83. Under New York law, *Ferreira v. City of Binghamton* (NY 2022)*,* all police officers and officials involved in the execution of this "no knock" Search Warrant owed a "special duty" of care to Plaintiffs. Even a negligent violation of that duty is actionable.

84. Defendants' misconduct allows Plaintiffs to recover damages for negligent infliction of emotional distress because Defendants' breaches of a duty owed to Plaintiffs unreasonably endangered Plaintiffs' physical safety and/or caused each of them to fear for their own safety.

85. The factual allegations set forth above demonstrate at least negligence. HOGAN identified himself as the spokesperson and planner of the event, reaching out to other law enforcement agencies to assist in the execution of 5 simultaneous searches, including the search of Plaintiffs' home in Montauk, which was in HOGAN's "beat". Although he had responsibility of planning the event which involved the other law enforcement agencies he invited, HOGAN made no provisions for: (1) portable sanitation facilities outside of the house for use of the female occupants, (2) the East Hampton Volunteer EMTS to be ready on stand-by in the event of a bleeding injury or any injury, (3) a female police officer to be constantly present with the 11-year old girl in the event she needed to use the toilet facilities or cry, and (4) the possibility that

JOAN and FRANKLIN's handcuffs would need to be loosened and repositioned in the front of their bodies after a reasonable of time while awaiting for another supervisor or representative of the Suffolk County District Attorney's Office to arrive to observe the scene at which no drugs or contraband was found.  HOGAN was a relatively inexperienced Detective and HOGAN performed his planning in a grossly negligent manner, foreseeably causing pain, suffering and physical harm to Plaintiffs.

86. Defendants, including HOGAN, breached their duty of care, and such breaches directly resulted in the infliction of emotional harm and Plaintiffs' mental suffering.

87. Plaintiffs' claims possess a substantial guarantee of genuineness.

88. In any event, under New York law, a breach of a duty of care directly resulting in emotional harm is compensable in a court of law even if no physical injury occurred.

89. Defendants also breached their respective duties of care by infliction of emotional distress upon Plaintiffs by their conjoined failure to intercede to prevent more harm.

90. Defendants engaged in (1) extreme and outrageous conduct, (2) with an intent to cause, or disregard the substantial probability of causing, severe emotional distress, (3) there is a causal connection between the conduct and injury, and (4) severe emotional distress was caused.

91. Defendants' conduct and inconsideration directed toward J.M., by treating her as a hostage and separated from her worrying mother, was deliberately shocking and traumatizing.

92. Some of the conduct was so extreme in character and degree, as to go beyond all possible bounds of decency in a civilized society and to be regarded as atrocious, and utterly intolerable in civilized society in America.

93. J.M. experienced severe emotional distress on October 5th, 2022, as a consequence of Defendants' conduct and the deliberate custom, policy and policing failures of the TOWN and COUNTY about the  dynamic, chaotic, unpredictable and dangerous surprise "raid".

94. Plaintiffs are entitled to compensatory and punitive damages as consequence.

## **RELIEF REQUESTED**

**WHEREFORE**, Plaintiffs pray for relief as follows:

1.  compensatory damages in an appropriate amount to cover all damages, no less than the following for each Plaintiff:  GARCIA JIMENEZ: $100,000.00; GARCIA JIMENEZ for her minor daughter J.M.: $82,000.00; CAMPOVERDE: $225,000.00; JIMENEZ: $101,000.00

2.  for each Plaintiff, punitive damages unless prohibited by law;

3. Costs of this action;

4. Statutory attorneys fees under 42 U.S.C. § 1988, at hourly rates commensurate with each attorney's skill and expertise

5. Statutory attorneys fees in the Equal Access to Justice Act, 28 U.S.C. § 2412;

6. Awarding such other legal and equitable relief as this Court deems just and proper, including temporary and permanent injunctive relief if it is required.


**PLAINTIFFS REQUEST A TRIAL BY JURY.**

Dated:   August 25, 2025                    Respectfully submitted,

*/s/ Patricia Weiss, Esq.*
 Patricia Weiss, Esq.
*Attorney for Plaintiffs*
78 Main Street – Suite 14
P.O. Box 751
Sag Harbor, NY 11963
Tel. (631) 725-4486
Fax (631) 725-0295
PWESQSAG@aol.com

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK      X

JENNIFER GARCIA JIMENEZ, JENNIFER GARCIA
JIMENEZ on behalf of her minor daughter "J.M.",
FRANKLIN CAMPOVERDE, and JOAN MANUEL
JIMENEZ,

                         Plaintiffs              # 23-cv-09476 (AMD/SIL)

   - against -

COUNTY OF SUFFOLK, SUFFOLK COUNTY POLICE
DETECTIVE SOLON PARKER, POLICE OFFICER
DANIEL LILLIS, TOWN OF EAST HAMPTON, EAST
HAMPTON TOWN POLICE DETECTIVE RYAN HOGAN,
POLICE OFFICER ANDREW BLODORN, POLICE
OFFICER BRYAN COBB, POLICE DETECTIVE DAVID
ORLANDO, POLICE OFFICER TYLER GILBRIDE,
POLICE DETECTIVE MICHAEL COLEMAN, POLICE
DETECTIVE LUKE McNAMARA, POLICE OFFICER
JUAN BUITRAGO, POLICE DETECTIVE ARTHUR
SCALZO, POLICE OFFICER KATHERINE IZZO,
                        Defendants.
_____X
_____

# **SECOND AMENDED COMPLAINT**
_____

 Patricia Weiss, Esq.
*Attorney for Plaintiffs*
Sag Harbor Shopping Cove
78 Main Street – Suite 14
P.O. Box 751
Sag Harbor, NY 11963
Tel. (631) 725-4486
Fax (631) 725-0295
PWESQSAG@aol.com